UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:22-cr-00086-JAW |
| | ) | |
| LUIS MARTINEZ | ) | |

**ORDER ON MOTION TO SUPPRESS**

A criminal defendant brings a motion to suppress evidence, arguing that a sheriff's deputy violated the Fourth Amendment by unlawfully prolonging a traffic stop and converting a *Terry* frisk into an unlawful search. Because the Court finds that the deputy had reasonable suspicion to deviate from the mission of the traffic stop and had not ruled out that an object in the defendant's pants could be a weapon, the Court denies the defendant's motion.

# I.   PROCEDURAL BACKGROUND

On May 24, 2022, Luis Martinez was charged with one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). *Criminal Compl.* (ECF No. 1). On July 7, 2022, a federal grand jury returned a three-count indictment against Mr. Martinez, charging him with 1) possession with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine on September 5, 2021 in violation of 21 U.S.C. § 841(a)(1), 2) possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine on February 8, 2022 in violation of 21 U.S.C. § 841(a)(1), and 3) possession of a firearm by a felon on February 8, 2022 in violation of 18 U.S.C.

§ 922(g)(1). *Indictment* (ECF No. 18). The indictment also contained two forfeiture allegations. *Id.* at 2-3.

On November 25, 2022, Mr. Martinez filed a motion to suppress evidence related to a traffic stop on September 5, 2021.[1] *Def.'s First Mot. to Suppress* (ECF No. 49). On January 18, 2023, the Government responded to Mr. Martinez's motion to suppress, *Gov't's Omnibus Resp. to Def.'s Mots. to Suppress* (ECF No. 60) (*Gov't's Opp'n*), and on the following day, January 19, 2023, it filed additional documents in support of its opposition, including law enforcement reports and body-camera video. *Attachs. 1-11* (ECF No. 61) (*Gov't's Suppress Attachs.*). On March 1, 2023, Mr. Martinez replied. *Def.'s Reply to the Gov't's Omnibus Opp'n to Mots. to Suppress* (ECF No. 69) (*Def.'s Reply*). Over the Government's objection, the Court granted Mr. Martinez's motion for an evidentiary hearing, *Order* (ECF No. 70), and held the hearing on May 18, 2023. *Min. Entry* (ECF No. 84).

After the conclusion of the May 18, 2023 evidentiary hearing, the parties filed post-hearing memoranda. On November 3, 2023, Mr. Martinez filed his post-hearing memorandum. *Def.'s Post-Hearing Mem. in Support of Mot. to Suppress* (ECF No. 116) (*Def.'s Mem.*). On November 6, 2023, the Government filed its post-hearing memorandum. *Gov't's Post Hearing Mem. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 120) (*Gov't's Mem.*). On November 20, 2023, Mr. Martinez responded to the Government's memorandum. *Def.'s Resp. to the Gov't's Post-Hearing Mem.* (ECF No.

---

[1]    Mr. Martinez filed a second motion to suppress on November 25, 2022, directed to the search and seizure on February 8, 2022 that led to Counts Two and Three of the indictment. *Def.'s Second Mot. to Suppress* (ECF No. 50). On May 18, 2023, Mr. Martinez orally withdrew the second motion to suppress. *Withdrawal of Mot.* (ECF No. 85).

123) (*Def.'s Reply Mem.*).   That same day, the Government responded to Mr. Martinez's memorandum.   *Gov't's Post-Hearing Reply Mem. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 124) (*Gov't's Reply Mem.*).

## II.   FACTUAL BACKGROUND

### A.   Deputy Nathan Chisholm's Training and Experience

Deputy Nathan Chisholm[2] first became a law enforcement officer when he joined the police department for the town of Van Buren, Maine in 2013.   *Tr. of Proc.* at 20:3-5 (*Suppression Tr.*).   In January 2020, Deputy Chisholm joined the Aroostook County Sheriff's Office, where he is still employed.   *Id.* at 20:8-9.   In October 2018, Deputy Chisholm was certified as a K-9 handler, and his K-9, Jazz, is a certified narcotics-detection dog.   *Id.* at 20:17-21:9.   During Deputy Chisholm's K-9 training, he was taught drug interdiction, which became his specialty.   *Id.* at 21:15-20; 22:18-20.

At the suppression hearing, Deputy Chisholm testified that he was familiar with the drug trade in Aroostook County, including how drugs enter the county.   *Id.* at 23:16-18, 23:24-24:2.   Deputy Chisholm further testified that he would participate in weekly meetings with the Maine Drug Enforcement Agency (MDEA), during which the MDEA "would share information with me on what areas to focus on and what things to look for when out on patrol."   *Id.* at 24:5-10.   In these meetings, Deputy Chisholm learned that "large quantities of drugs were being supplied from larger

---

[2]      Deputy Chisholm has been promoted to Sergeant since the events underlying Mr. Martinez's motion to suppress.   *Tr. of Proc.* at 20:10-11 (*Suppression Tr.*).   Since the relevant actions here took place while Sergeant Chisholm was still a Deputy, the Court uses "Deputy Chisholm" throughout this order for consistency.

cities like Portland, Bangor, Lewiston specifically." *Id.* at 24:16-19. He was also advised that drug dealers coming to Aroostook County would "utilize local users or local people to . . . get around" and "also utilize hotels or local users for residency while they deliver or deal drugs." *Id.* at 46:15-21.

Van Buren, Maine is a town of roughly 2,000 people, and Deputy Chisholm testified that he is familiar with the town's residents. *Id.* at 25:17-21. In 2021, after the town's police department disbanded, the Aroostook County Sheriff's Office reassumed responsibility for policing in Van Buren. *Id.* at 20:12-13; 25:10-13. During the suppression hearing, Deputy Chisholm testified that Kennedy Terrace, a low-income housing development at the northern end of Van Buren, "is our trouble area" because there are "a lot of drug issues over there, a lot of thefts, a lot of burglaries, domestic violence issues." *Id.* 28:10-29:1.

Deputy Chisholm has received one reprimand during his time at the Aroostook County Sheriff's Office. On July 31, 2022, Deputy Chisholm used deadly force against a suspect. *Mot. to Suppress Hr'g*, *Giglio* Ex. 4, *Reprimand*. After the incident, Deputy Chisholm "indicated he thought he had his body camera on during the altercation but when he went to turn it off, he had actually turned it on." *Id.* As a result, Deputy Chisholm received a reprimand that concluded, "Due to not activating the body worn camera Sgt. Chisholm was in violation of the Wearable Video Camera (WVC) policy." *Id.* The reprimand stated that "Sgt. Chisholm needs to utilize his wearable video camera at all times according to policy." *Id.* Deputy Chisholm acknowledged the reprimand by signing it. *Id.*

### B.     The Traffic Stop

Between approximately 11:00 pm and 11:30 pm on September 4, 2021, Deputy Chisholm drove from Caribou, Maine, to Van Buren, Maine.  *Suppression Tr.* at 28:2-12.   When Deputy Chisholm arrived in Van Buren, he drove through Kennedy Terrace.  *Id.* at 28:13-14.   There, he noticed activity outside the apartment of "S," whom he had previously charged with drug possession.  *Id.* at 29:4-23.   Although Deputy Chisholm did not witness any criminal activity, he nonetheless found the activity significant because it was close to the first of the month, when the residents of Kennedy Terrace receive their checks from the government for welfare assistance. *Id.* at 29:23-30:5.  After driving through Kennedy Terrace, Deputy Chisholm parked on Main Street to conduct radar surveillance.  *Id.* at 30:9-14.

At approximately 12:15 am on September 5, 2021, Deputy Chisholm observed a black sedan travelling through the town of Van Buren.  *Gov't's Suppress Attachs.*, *Excerpt of Chisholm Original Narrative* at 1 (*Chisholm Narrative*).   Deputy Chisholm's radar identified the vehicle as traveling 45 miles-per-hour in a 30 mile-per-hour zone, so he initiated a traffic stop for speeding.  *Id.* at 1-2.  According to Deputy Chisholm, it would have taken backup officers twenty-five to thirty minutes to arrive at the location where he stopped the car.  *Suppression Tr.* at 47:3-10.

Upon reaching the car, Deputy Chisholm recognized the driver, Joshua Castonguay, and the front passenger, Kayla Carmichael, from past police interactions but did not recognize the rear passenger, later identified as Luis Martinez.  *Id.*  Mr. Castonguay had previously disclosed to Deputy Chisholm that he had a habit of using illegal drugs as of 2016 or 2017 and 2019.  *Suppression Tr.* at 37:20-24, 38:12-16, 39:5-

19. Ms. Carmichael had also told Deputy Chisholm as recently as 2019 that she used illegal drugs. *Id.* at 20:21-41:19. Deputy Chisholm knew that Mr. Castonguay and Ms. Carmichael lived at Kennedy Terrace, directly across from the apartment of "S." *Id.* at 43:2-10.

Deputy Chisholm asked Mr. Castonguay where he was headed and why he was in such a hurry. *Gov't Suppress Attachs.*, Attach. 1, *Chisholm First Body Camera Video* at 00:28:24 (*First Video*). Mr. Castonguay responded that he was heading to Presque Isle (an approximately 35-mile drive from Van Buren) and did not realize how fast he was going. *Id.* at 00:28:26. Deputy Chisholm asked all three vehicle occupants for identification and asked Mr. Castonguay for the vehicle's registration and insurance information. *Id.* Mr. Castonguay and Ms. Carmichael responded that they did not have their licenses with them, while Mr. Martinez handed Deputy Chisholm a Maine driver's license listing his address as a P.O. box in Portland, Maine. *Id.* at 00:28:44-00:29:06. Deputy Chisholm testified that Mr. Castonguay's lack of a driver's license did not "raise[] concern" because he could "find him and get his date of birth another way." *Suppression Tr.* at 42:14-18.

During his interaction with Mr. Castonguay, Deputy Chisholm asked whether the group was headed to Caribou, to which Mr. Castonguay responded that they were and that "they were looking for a hotel for Mr. Martinez."[3] *Suppression Tr.* at 45:3-

---

[3]   Deputy Chisholm testified that he was "initially told they were heading to Presque Isle, and then it changed to they were heading to Caribou." *Suppression Tr.* at 45:3-5. He further testified that he believed Mr. Castonguay's characterization of the group's travel plans changed in response to his question about whether the group was traveling to Caribou. *Id.* at 45:6-9. While Deputy Chisholm sometimes intentionally misquotes a person's previous statements "as a tactic," he testified that he believed he misspoke in this situation. *Id.* at 45:10-13.

13.   Deputy Chisholm asked Mr. Castonguay if there were any drugs, alcohol, or firearms in the vehicle and received a negative response. *First Video* at 00:29:20-00:29:40; *Suppression Tr.* at 50:17-25.   Deputy Chisholm then asked Mr. Castonguay "if my canine ran around the outside [of the vehicle], would he alert to anything?" and "any issue with me looking through the vehicle?" *First Video* at 00:29:20-00:29:40; *Suppression Tr.* at 50:17-25, 51:9-13.   Mr. Castonguay responded "no" or "nope" to each question. *First Video* at 00:29:20-00:29:40; *Suppression Tr.* at 50:17-25, 51:9-13.

While he was speaking with Mr. Castonguay, Deputy Chisholm observed that Mr. Martinez "did not make eye contact with [him] and slouched in the seat looking toward the passenger side of the car as if to avoid eye contact." *Chisholm Narrative* at 2.   This behavior led Deputy Chisholm to believe that Mr. Martinez was "trying to disassociate himself with what was going on" because "[t]raditionally in a traffic stop the back seat passengers are engaged with me and they're focused on what I'm doing." *Suppression Tr.* at 46:6-9.

After speaking with Mr. Castonguay, Deputy Chisholm returned to his police cruiser to run checks on the occupants' information. *Chisholm Narrative* at 2; *Suppression Tr.* at 52:11-18.   He first checked Mr. Castonguay's information. *Suppression Tr.* at 53:21-54:1.   Afterwards, he checked Mr. Martinez's information. *Id.* at 53:21-54:6.   While doing so, he learned that Mr. Martinez's Maine driver's license was associated with an address in California. *Id.* at 56:7-11.   Deputy Chisholm testified at the suppression hearing that he found this to be "odd" because "I've never ran somebody in the state of Maine that has a Maine ID or a license but

it shows a California address.  Typically . . . if you live in Maine and you have a residency here, you would have an address in the state of Maine."  *Id.* at 56:20-24. Deputy Chisholm's computer system did not flag any illegalities associated with Mr. Martinez's license, though Deputy Chisholm testified that the system sometimes made mistakes.  *Id.* at 93:13-20, 117:3-6.

　　While in his police cruiser, Deputy Chisholm observed "[Mr. Martinez] moving around a lot in the back seat and [Ms. Carmichael] looking back at my cruiser as if she [was] keeping a look out on what I was doing."  *Chisholm Narrative* at 2; *Suppression Tr.* at 54:21-55:12.  Deputy Chisholm further observed that Mr. Martinez was looking down and that Ms. Carmichael "would look down at him in that same area and then look back" at the police cruiser.  *Suppression Tr.* at 55:9-18.  This made Deputy Chisholm "concerned that [Mr. Martinez] was doing something around his crotch area or the floorboard of the vehicle."  *Id.* at 55:15-16.  Deputy Chisholm testified that it was "very odd" for Ms. Carmichael to be looking back at the police cruiser during this time.  *Id.* at 111:20-24.

　　After approximately ten minutes, Deputy Chisholm returned to the sedan. *Compare First Video*, *with Add'l Attachs.*, Attach. 2, *Chisholm Second Body Camera Video* (*Second Video*) (the timestamping between the videos appears to be consistent, showing Deputy Chisholm step away from the vehicle at the 00:29:40 mark and return at the 00:39:30 mark).  By this time, Deputy Chisholm had determined not to issue Mr. Castonguay a speeding ticket.  *Suppression Tr.* at 100:24-101:10.  Deputy

Chisholm instead asked Mr. Castonguay to step out of the vehicle to speak with him. *Second Video* at 00:39:32.

Once outside, Deputy Chisholm asked Mr. Castonguay where he was driving Mr. Martinez and Mr. Castonguay responded "Caribou, I guess . . . I don't even really know his name to tell the truth" and added that Mr. Martinez had offered him $50 for the ride. *Id.* at 00:39:40-00:40:10. Mr. Castonguay then stated that he had picked Mr. Martinez up at "S's" home. *Id.* at 00:40:10-00:40:40. Deputy Chisholm expressed his surprise to Mr. Castonguay that Mr. Martinez was "showing he's out of Portland and then when you run his license he comes out of California . . . on his Maine license, which is weird." *Second Video* at 00:40:40-00:41:00. Deputy Chisholm asked Mr. Castonguay if he was "okay" with Deputy Chisholm searching the car and Mr. Castonguay replied that he was. *Id.* at 00:41:00-00:41:30.

After speaking with Mr. Castonguay, Deputy Chisholm again approached the car to ask Ms. Carmichael to step out and speak with him. *Id.* at 00:41:40-00:41:48. As he was doing so, he noticed that Mr. Martinez was "down in his . . . crotch area." *Suppression Tr.* at 63:16-64:2. When Deputy Chisholm began to speak with Ms. Carmichael, he noticed Mr. Martinez "had stopped doing what he was doing." *Id.* Ms. Carmichael then exited the car to speak with Deputy Chisholm. *First Video* at 00:42:00. Ms. Carmichael stated that she did not know Mr. Martinez's name and that a friend had asked them to give him a ride. *Id.* at 00:42:00-00:42:40. Deputy Chisholm then asked Ms. Carmichael whether Mr. Martinez was "easy to deal with"

9

because Deputy Chisholm had a "concern" that Mr. Martinez "may have a weapon or something like that." *Suppression Tr.* at 63:8-15.

### C.    The Pat-Down Search

Immediately after talking to Ms. Carmichael, Deputy Chisholm asked Mr. Martinez to step out of the car and inquired whether he was carrying any weapons, drugs, alcohol, or large amounts of cash. *Second Video* at 00:42:50-00:43:10. Mr. Martinez replied that he had "some cash" but no weapons, drugs, or alcohol. *Id.* Deputy Chisholm asked, "Do you mind if I pat you down, just for a weapon?" and Mr. Martinez replied "okay." *Id.* While patting down Mr. Martinez's pocket, Deputy Chisholm asked if he was feeling the money Mr. Martinez had referenced and Mr. Martinez replied in the affirmative and advised that he was carrying approximately $1,000. *Id.* at 00:43:10-00:43:30. Deputy Chisholm also located a pocket-knife clipped to Mr. Martinez's pocket and removed it with his consent. *Id.*

While frisking Mr. Martinez's groin area with the back of his hand, Deputy Chisholm felt a large object in Mr. Martinez's crotch that had a "mass inconsistent with genitals." *Chisholm Narrative* at 3-4. This object was in the center of Mr. Martinez's crotch, near where the seams of his pants met, and Deputy Chisholm could not identify whether it was a weapon. *Suppression Tr.* at 67:7-16. Deputy Chisholm asked Mr. Martinez what the object was and Mr. Martinez replied that it was his penis. *Second Video* at 00:43:50-00:44:30.

After this exchange, Deputy Chisholm stood up to ask Mr. Martinez additional questions about the object in his pants. *Suppression Tr.* at 68:5-10. Their conversation unfolded as follows:

> **Deputy Chisholm:** All right.  Well, it doesn't feel like your cock.  Feels like you got something in there.  Do you have a diaper in there or what?
> **Mr. Martinez:** No. I have nothing in there.
> **Deputy Chisholm:** So if my narcotics canine smelled your crotch, you're not going to have anything on your crotch.
> **Mr. Martinez:** No.  Of course not.  No.  No, sir.
> **Deputy Chisholm:** There's nothing in your crotch.
> **Mr. Martinez:** No.
> **Deputy Chisholm:** I'm not feeling anything in your crotch.
> **Mr. Martinez:** No, there's nothing.
> **Deputy Chisholm:** Okay.

*Mot. to Suppress Hr'g*, Gov't's Ex. 3B, *Tr. Body Cam - Deputy Chisholm* at 13:13-14:5 (*Second Video Tr.*).

After this exchange, Deputy Chisholm resumed his pat-down frisk in an attempt to make sure that the item he was feeling in Mr. Martinez's pants was not a firearm. *Suppression Tr.* at 68:11-13. Deputy Chisholm "squeezed [the object] maybe two or three times and determined that it wasn't a firearm or a weapon, a knife, and that it -- it was more consistent with packaging." *Id.* at 68:13-15. At that point, Deputy Chisholm stood up again, and the following exchange ensued:

> **Deputy Chisholm:** What's in your pants?
> **Mr. Martinez:** That's my dick.
> **Deputy Chisholm:** What's in your pants?
> **Mr. Martinez:** My dick.
> **Deputy Chisholm:** Do you have something -- an issue with your dick?
> **Mr. Martinez:** No, I don't -- yeah, dude.  I have an issue with my dick, dude.  I don't like people touching it.

*Second Video Tr.* at 14:10-18.  Deputy Chisholm later described this incident as follows:

11

> While frisking [Mr. Martinez's] crotch area with the back of my hand I felt a large object in his crotch,  The object had mass inconsistent with genitals.  I asked Luis what was in his pants.  I was unsure at [that] time if the item was a weapon or not and Luis had not provided me with a concealed weapons permit or stated that he had a firearm. Due to his movements in the car, I investigated further and manipulated the item in his crotch to get a better understanding on what it was. I could feel the mass was consistent with packaging. I could feel what appeared to be tape around the object. Through my training, experience and education I deemed the item consistent with the packaging of illegal drugs.

*Chisholm Narrative* at 3-4.  Deputy Chisholm did not touch Mr. Martinez's genitalia at any time during the pat-down frisk.  *Suppression Tr.* at 69:2-4.

After squeezing the item in Mr. Martinez's pants, Deputy Chisholm directed Mr. Martinez to walk back to his police cruiser, although he had not finished the pat-down frisk.  *Second Video* at 00:44:30-00:44:50; *Suppression Tr.* at 69:15-70:5. Deputy Chisholm testified that he abandoned the pat-down frisk because he "was more focused on what [he] believed to be contraband in [Mr. Martinez's] pants." *Suppression Tr.* at 70:6-11.  Deputy Chisholm further testified that he remained concerned that Mr. Martinez might possess a weapon because he did not finish the pat-down frisk.  *Id.*

While walking to the police cruiser, Mr. Martinez pulled several steps away from Deputy Chisholm and reached into his front waistband.  *Second Video* at 00:44:50-00:45:00.  Deputy Chisholm drew his firearm and grabbed Mr. Martinez from behind.  *Id.* at 00:44:50-00:45:00.  Mr. Martinez began pulling away from Deputy Chisholm, and the two fell to the ground.  *Id.*; *Suppression Tr.* at 71:19-72:9.

Mr. Martinez got up and ran toward the nearby woods. *Chisholm Narrative* at 4. Deputy Chisholm observed that Mr. Martinez's "hands were not out at his sides in a running motion [but] rather still in front of him near his waist band" and "he was running with his legs spread widely open," which Deputy Chisholm viewed as indicative of Mr. Martinez "still trying to retrieve something from his pants." *Id.* Deputy Chisholm did not actually see Mr. Martinez retrieve or throw anything from his pants, though he testified that it was difficult to see because of his cruiser's flashing lights. *Suppression Tr.* at 74:15-20-75:4.

As Mr. Martinez was running, Deputy Chisholm drew and fired his taser, striking Mr. Martinez in the shoulder. *Chisholm Narrative* at 4. Despite being knocked to the ground, Mr. Martinez managed to remove the taser probes and continue running toward the woods before he was eventually tackled and—after a brief struggle—handcuffed by Deputy Chisholm. *Id.* at 4-5.

Deputy Chisholm brought Mr. Martinez back to the roadway and sat him in front of the police cruiser. *Id.* at 5. Mr. Martinez apologized and denied having anything in his pants. *Id.* According to Deputy Chisholm's report, at one point Mr. Martinez informed Deputy Chisholm that the item was no longer in his pants, but quickly corrected himself to say that nothing was ever in his pants. *Id.* Other officers arrived and Deputy Chisholm attempted to deploy Jazz to search the area for drugs, but Jazz refused to engage. *Id.*; *Suppression Tr.* at 79:20-80:7.

Deputy Chisholm later noticed that Mr. Martinez had removed his shoes and socks while seated on the ground. *Chisholm Narrative* at 5. He also searched Mr.

Martinez's crotch area and noted the object he had felt earlier was gone. *Id.* Later, when collecting Mr. Martinez's shoes and socks, Deputy Chisholm located a small bag of white powder later determined to contain cocaine, *id.* at 5-6, which Deputy Chisholm testified did not feel like the item he had felt during the pat-down frisk of Mr. Martinez. *Suppression Tr.* at 78:16-18.

Mr. Martinez was arrested and brought to the Caribou Police Department. *Id.* at 6. Several hours later, Deputy Chisholm was informed by another officer that a canine unit searching the wooded area where Mr. Martinez had fled had discovered a thin cloth sack carrying a taped-up ball later determined to contain methamphetamine. *Id.* Mr. Martinez was arrested on state drug trafficking charges.

## III. POSITIONS OF THE PARTIES

### A. Luis Martinez's Motion to Suppress

Mr. Martinez moves to "suppress all evidence secured as a result of an illegal seizure and search on September 5, 2021." *Mot. to Suppress* at 1.

First, Mr. Martinez contends that he has standing to challenge the traffic stop because when Deputy Chisholm initiated the stop and took Mr. Martinez's license, Mr. Martinez "was clearly 'seized' within the meaning of the Fourth Amendment for the entire duration of the stop" and thus "has standing to challenge the stop and to move for the exclusion of evidence obtained as a result of that stop." *Id.* at 4.

Next, Mr. Martinez asserts that Deputy Chisholm illegally prolonged the stop because "[r]ather than 'diligently pursu[ing]' the purpose of the traffic stop, Deputy Chisholm focused on conducting a drug investigation from the outset, without

articulable basis to do so." *Id.* at 5 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).  Mr. Martinez offers that "Deputy Chisholm's only purported basis for the traffic stop was speeding" and he "had no basis to suspect the driver was impaired or that any other illegal activity had occurred." *Id.* at 6.  Nonetheless, Mr. Martinez contends, "from the outset, it was clear Deputy Chisholm was concerned primarily with investigating the possibility of other criminal activity" despite "lack[ing] a reasonable articulable basis to expand the stop beyond the traffic infraction." *Id.* at 6-7.  He concludes that "[a]s this protracted detention was unreasonable and unlawful, the fruits obtained from the stop must be suppressed." Id. at 7.

Mr. Martinez goes on to argue that Deputy Chisholm also illegally searched him. *Id.*  He notes that, under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may briefly detain and pat down an individual to determine if they are carrying a weapon, but he submits that "[r]ather than a limited and minimally intrusive frisk, in this case the pat down of Mr. Martinez lasted over a minute and a half." *Id.* at 7-8.  Mr. Martinez adds that "[a]s is clear from the officer's questions, what he was touching did not resemble the feel of a weapon" but Deputy Chisholm "continued to touch and probe Mr. Martinez's body." *Id.* at 8.  Mr. Martinez asserts that "[a]s any evidence subsequently obtained by the government is tainted by the illegality of Deputy Chisholm's search, it must be suppressed." *Id.*

### B.   The Government's Response

In response to Mr. Martinez's motion, the Government counters that: (1) the traffic stop was lawful and not unduly prolonged; (2) Mr. Martinez was properly

frisked; and (3) Mr. Martinez lacked an objectively reasonable privacy interest in the seized property. *Gov't's Opp'n* at 1-28.

The Government first argues that Mr. Martinez did not have a reasonable expectation of privacy with respect to any of the seized items. *Id.* at 13. In support of this conclusion, it contends that officers discovered the small bag of cocaine on the ground near where Mr. Martinez sat and the bag of methamphetamine in the brush where Mr. Martinez had fled. *Id.* at 14. In the Government's view, Mr. Martinez "has not claimed ownership of either item, he has not alleged that the items were on his person at the time of the traffic stop, and he has not claimed any ownership or privacy interest in the area in which they were seized," and thus Mr. Martinez "has not met his burden to demonstrate an objectively reasonable privacy interest in the items, and the Court should deny his motion to suppress [this] evidence." *Id.* at 14-15. The Government further submits that "[e]ven assuming Defendant could establish a privacy interest in the seized cocaine and methamphetamine, any such interest was forfeited when Defendant fled from Deputy Chisholm and abandoned the drugs" and that "[e]ven if Defendant was unlawfully seized prior to abandoning the drugs, the initial seizure was terminated when Defendant fled from Deputy Chisholm." *Id.* at 15. It concludes that, ultimately, "Defendant did not retain any expectation of privacy in the drugs, much less a reasonable one" and his motion should be denied. *Id.* at 16.

Second, the Government contends that the traffic stop was lawful and not unduly prolonged. *Id.* at 19. It submits that "the initial mission of the traffic stop

was to identify the vehicle's operator and issue a warning or citation for speeding," and Deputy Chisholm's "brief initial inquiries were reasonable officer safety measures that did not measurably prolong the stop." *Id.* at 20-21. While the stop began in response to a speeding violation, the Government asserts that "Deputy Chisholm had reasonable suspicion to suspect the occupants were involved in criminal activity, specifically activity involving drugs" and was therefore "permitted to increase the scope of his investigation by degrees," including "conducting records checks not just on the driver, but on the passengers." *Id.* at 21-22. In the Government's view, because each step of Deputy Chisholm's "limited investigation was supported by reasonable suspicion," the investigation "was thus lawful" up until the pat-down of Mr. Martinez. *Id.* at 22. From that point on, "Deputy Chisholm's further actions were justified by his continuing reasonable suspicion, as well as valid safety concerns." *Id.*

Third, the Government argues that the pat-down was not an illegal search. *Id.* It submits that while "Deputy Chisholm spoke with the Driver and the female Passenger, he noticed the Defendant slouching low and fidgeting with his waist" and "[u]nder the circumstances of the stop, this supported a reasonable belief that Defendant was armed, and a pat-down was proper." *Id.* at 23. Alternatively, the Government offers that the pat-down was lawful because Mr. Martinez provided "clear consent when Deputy Chisholm asked if he could pat him down." *Id.* at 23-24.

The Government argues further that the scope of the search was proper because "Deputy Chisholm did not simply remove every item he felt in Defendant's

clothing." *Id.* at 24.   Instead, "[w]hen Deputy Chisholm felt a large bulge in Defendant's pants" and "was unsure whether it was a weapon or not," he "reasonably attempted to determine whether the bulge was a weapon by continuing the pat-down and asking Defendant what was in his pants." *Id.*  Then, "[u]pon continuing the pat-down, Deputy Chisholm was able to feel that the item had a tape wrapped around an object, which he then recognized as consistent with narcotics packaging" and, at that point, he "had probable cause to seize the item, but couldn't because Defendant fled and resisted arrest." *Id.* at 25.

## C.   Luiz Martinez's Reply

In reply, Mr. Martinez first argues that "the Government misunderstands the scope of fruits Mr. Martinez requests this Court suppress." *Def.'s Reply* at 2.  He contends that, while the Government's analysis focuses on the seized drugs, "in addition to the two bags of contraband cited in the Government's motion, Mr. Martinez seeks to suppress the cash and knife found in his pocket, Officer Chisholm's observations about his demeanor, Officer Chisholm's observations about feeling an object in Mr. Martinez's crotch area, statements Mr. Martinez made to Officer Chisholm during the illegal roadside search, Officer Chisholm's observation about Mr. Martinez adjusting his pants, the observations of all other responding officers, as well as all body cam footage or reports depicting or detailing the same events." *Id.* at 2-3.  Mr. Martinez asserts that the exclusionary rule bars admission of this evidence as "fruits of an illegal detention and unlawful search." *Id.* at 3.

Mr. Martinez also submits that the Government's standing argument "confuses the requirement that the Defendant demonstrate a privacy interest in the item *that was the subject of the illegal search or seizure* and the separate determination – made only after establishing the Fourth Amendment violation – as whether evidence obtained was a fruit of the illegal search of seizure." *Id.* (emphasis in original).

Next, Mr. Martinez argues that "[b]eginning at the outset of the initial traffic stop through to his placement in handcuffs and transportation to jail, Mr. Martinez was continuously seized." *Id.* at 6. He adds that "even if the Court were to determine the seizure was temporarily paused for the seven seconds in between when Mr. Martinez fell and was tased, as Mr. Martinez did not voluntarily abandon the contraband during this period [] it remains fruit of a violation of his Fourth Amendment rights." *Id.* at 6-7. Ultimately, Mr. Martinez concludes that he "was seized from the outset of the traffic stop" and "[a]s his detention was unlawfully prolonged and he was subjected to an illegal search, he has standing to challenge the admission into evidence of both direct and indirect fruits of the violation." *Id.* at 7.

Mr. Martinez then turns to contending that Deputy Chisholm "lacked an objective basis to prolong the stop." *Id.* He offers that there was no evidence that Deputy Chisholm "had knowledge that at the time of the stop [Mr. Castonguay and Ms. Carmichael" were current drug users"; Mr. Castonguay's and Ms. Carmichael's lack of identification was not an indicator of any criminal activity, let alone drug activity; Mr. Martinez's residence in Portland, stated intention to stay at a hotel in

Presque Isle, and the time add little if anything to the analysis; and any signs of nervousness Mr. Martinez exhibited were entirely normal responses to Deputy Chisholm's "prolonged detention, separate interrogations, and invasive search." *Id.* at 7-10.

Mr. Martinez submits that, even if "the Court finds the prolonged detention was justified, suppression is still warranted based on the illegal search of his person." *Id.* at 12.  In his view, "it is simply not credible to believe that an officer who over the ninety second search repeatedly asked whether Mr. Martinez was wearing a diaper or had something wrong with his penis, harbored a good-faith belie[f] that the object was a weapon" and thus "[a]s Officer Chisholm no longer had a good-faith basis to believe the item was a weapon, but yet continued to unlawfully explore it in an attempt to determine its identity, he turned the frisk into a search." *Id.* at 13.  Even if Deputy Chisholm suspected the object to be narcotics, "the object[']s identity was not readily apparent" and therefore in Mr. Martinez's view, "was not subject to the plain-feel exception." *Id.*

Finally, Mr. Martinez offers that his flight did not cure the taint of the illegal detention and search, and thus the exclusionary rule should bar admission of the seized drugs. *Id.* at 13-15.

### D.    Luis Martinez's Post-Hearing Memorandum

In his post-hearing memorandum, Mr. Martinez "submits that the issues before the Court are: (1) Whether Mr. Martinez established a Fourth Amendment

violation, and (2) Whether Mr. Martinez may suppress the fruits of those violation(s)." *Def.'s Mem.* at 1.

In addition to the arguments in his motion and reply, Mr. Martinez advances several new arguments in support of his contention that he was unlawfully detained and searched in violation of the Fourth Amendment.   First, Mr. Martinez asserts that he "has a reasonable expectation of privacy in his own body," which confers "standing to challenge Sgt. Chisholm's frisk and search of his person during the stop." *Id.* at 6-7.

Second, Mr. Martinez contends "it is undisputed that when [Deputy Chisholm] returned to the vehicle the traffic stop was over." *Id.*  According to Mr. Martinez, Deputy Chisholm only knew three facts at this time: (1) that Mr. Castonguay and Ms. Carmichael had "previously struggled with drug addiction"; (2) that Mr. Martinez was allegedly making movements in the car; and (3) that Deputy Chisholm's inquiry "into Mr. Martinez's (valid) license reflected a California address." *Id.* at 8.  Mr. Martinez submits that these facts, taken together, "are insufficient to justify expanding the scope of the stop." *Id.*

Third, Mr. Martinez argues that Deputy Chisholm testified at the suppression hearing that it was clear to him that the bulge in Mr. Martinez's pants was not a weapon by the time he stood up to question Mr. Martinez about it. *Id.* at 9.  Therefore, Mr. Martinez continues, [a]s a *Terry* frisk is strictly limited to a search for weapons, and as Sgt. Chisholm did not credibly believe the mass to be a weapon, his further, continued exploration of the item to determine its identity was unlawful." *Id.*

Having, in his view, established that a Fourth Amendment violation occurred, Mr. Martinez then discusses in more detail the evidence he seeks to suppress. *Id.* at 10-12.  Mr. Martinez contends that the knife and cash found on his person should be suppressed as they were "discovered as a direct result of Sgt. Chisholm's illegally prolonged detention of Mr. Martinez." *Id.* at 10.  Similarly, Mr. Martinez claims that Deputy Chisholm's observations about there being a bulge in his pants and seeing him adjusting his pants, as well as his responses to Deputy Chisholm's questions during the search, should be suppressed as they were "discovered as a direct result of both the illegal detention and subsequent, illegal search." *Id.* at 11.

With respect to the methamphetamine found in the woods and the cocaine found by his foot, Mr. Martinez points out that the Government "did not invoke any of the established exceptions to the exclusionary rule" and therefore has not met its burden. *Id.*; *see id.* at 12.  Further, he argues that the attenuation doctrine is not applicable here because "the analysis hinges not on the time [of] recovery of the contraband, but rather, on the time [of] its discovery," and Deputy Chisholm discovered the methamphetamine while performing the pat-down search of Mr. Martinez. *Id.* at 12.

### E.  The Government's Reply to Luis Martinez's Post-Hearing Memorandum

In its reply to Mr. Martinez's post-hearing memorandum, the Government suggests it is "doubtful that Chisholm could have ruled out the possibility that the bulge [in Mr. Martinez's pants] was a weapon when he touched it with the back of his hand," and it represents that "Chisholm only determined that the item was not a

weapon when he squeezed it." *Gov't's Reply Mem.* at 2.  The Government further argues that "even if Chisholm believed it was probable that the item was drugs, he could still reasonably suspect the possibility that the item might be a weapon, permitting further exploration." *Id.*

The Government then shifts its argument, claiming that by the time Deputy Chisholm squeezed the bulge in Mr. Martinez's pants, he "had probable cause to arrest the Defendant and *would have* been authorized to seize the object from his pants." *Id.* (emphasis in original).  Even if Deputy Chisholm's squeezing of the object in Mr. Martinez's pants violated the Fourth Amendment, the Government continues, Mr. Martinez cannot claim any relief because "no evidence was seized *as a result* of the squeezing or any other possible violation of Defendant's privacy interests." *Id.* (emphasis in original).  Because of this, the Government contends that Mr. Martinez has not demonstrated any privacy interest in the methamphetamine and that evidence obtained after the pat-down search "was attenuated by Defendant's flight and illegal conduct." *Id.* at 2-3.

### F.   The Government's Post-Hearing Memorandum

In its post-hearing memorandum, the Government urges the Court to deny Mr. Martinez's motion to suppress because (1) "the traffic stop and ensuing investigation were lawful and not overly intrusive," (2) "the pat-down frisk was lawful and not overly intrusive," (3) "any possible Fourth Amendment violations were attenuated by Defendant's voluntary actions of fleeing from the stop, abandoning the seized drugs, and committing new and independent crimes," and (4) "Defendant has not met his

burden to demonstrate a privacy interest with respect to the seized drugs." *Gov't's Mem.* at 1.

In further support of its argument that the traffic stop was lawful and not unduly prolonged, the Government contends that Deputy Chisholm's activities during the initial phase of the stop—including collecting Mr. Castonguay's registration, asking about the group's travel plans, and asking Ms. Carmichael and Mr. Martinez for identification—were permissible "ordinary inquiries incident to the stop." *Id.* at 13-14 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). In the Government's view, Deputy Chisholm's other activities during the initial stop, such as asking questions concerning the presence of weapons or drugs in the vehicle, were permissible safety measures that "did not measurably extend the stop or immediately convert the encounter into a drug investigation." *Id.* at 17-18.

The Government further represents that "the low standard of reasonable suspicion was met very early in the stop, at or around the time Chisholm asked Defendant and [Ms. Carmichael] for identification." *Id.* at 14. This assertion is grounded in the Government's contention that "[t]he facts known to Chisholm at the time he asked for Defendant's and [Ms. Carmichael's] identification, included the type of facts that courts routinely find to support reasonable suspicion, when combined with other factors." *Id.* at 14-17. As the stop progressed, the Government continues, newly revealed information "added to the already reasonable suspicion that a drug crime was occurring and provided further grounds for Chisholm to expand his investigation." *Id.* at 18-19.

Turning to the pat-down frisk, the Government reiterates its arguments from its pre-hearing opposition brief including that "[t]he facts known to Chisholm at the time of the pat-down frisk, including his suspicion regarding drugs, supported a reasonable belief that Defendant was armed." *Id.* at 19-20.  Discussing the pat-down frisk itself, the Government contends that "[i]t was only upon Chisholm's additional squeezing that he determined the hidden object was not a weapon," and that the "squeezing was not beyond the scope of a proper pat-down because Chisholm had not yet ruled out the possibility it was a weapon." *Id.* at 21.  "Even if Chisholm's squeezing of the object exceeded the scope of a pat-down," the Government continues, "he would have been authorized to seize the object based on probable cause to arrest the Defendant on suspicion of possessing drugs." *Id.*

The Government then moves to its third argument, that any constitutional violation was attenuated by Mr. Martinez's intervening acts.  *Id.* at 22-27.  In the Government's eyes, Mr. Martinez's "voluntary intervening acts – running into the woods, violently resisting arrest, and discarding the drugs – separated the claimed constitutional violation and the ultimate discovery of the drugs." *Id.* at 22-23.  Here, the Government argues, "the drugs were discovered not because of any exploitation by Chisholm, but because Defendant ran into the woods and discarded them." *Id.* at 23.  According to the Government, Mr. Martinez's intervening acts were "particularly significant" because they provided "probable cause to believe that a new independent crime" had taken place that involved flight and the abandonment of evidence.  *Id.* at 23-24.  The Government then concedes that "a substantial time" did not elapse

between any unlawful police conduct and the discovery of the drugs in this case, but counters that "courts have no trouble finding attenuation based on factors other than temporal proximity even where evidence was discovered moments after unlawful police conduct." *Id.* at 25-26. Finally, the Government suggests that a finding of attenuation is warranted because "[e]ven assuming a violation occurred, it was not purposeful or flagrant" and was instead "at worst the result of a miscalculation by Chisholm as to the quantum of suspicion that had arisen or a brief detour from the mission of a lawful traffic stop." *Id.* at 26.

Turning to its fourth, and final, argument, the Government claims that Mr. Martinez failed to meet his burden to show a legitimate privacy interest in the seized drugs. *Id.* at 27-29. In support of this conclusion, the Government points out that its "allegation that Defendant has a possessory interest in the seized items does not relieve him of the burden to demonstrate a legitimate expectation of privacy with respect to each challenged item." *Id.* at 27. The Government goes on to contend that Mr. Martinez's "failure to assert any privacy interest in the seized drugs leaves him without standing to challenge their use as evidence against him." *Id.* at 28. Even if Mr. Martinez "maintained a subjective privacy interest in the seized cocaine and methamphetamine," the Government concludes, "any such interest was forfeited when Defendant fled from Deputy Chisholm and abandoned the drugs." *Id.* at 28-29.

### G. Luis Martinez's Reply to the Government's Post-Hearing Memorandum

Mr. Martinez begins his reply to the Government's post-hearing memorandum by arguing that the Government failed to prove that Deputy Chisholm had a

reasonable basis to prolong the traffic stop.  *Def.'s Reply Mem.* at 1-9.  According to Mr. Martinez, the Government "ignores the evidentiary record developed in the May 18, 2023, testimonial hearing," *id.* at 2, and  wrongly includes a number of factors in its reasonable suspicion analysis.  *Id.* at 2-7.

First, Mr. Martinez argues that Mr. Castonguay's lack of identification "should be afforded no weight" because "no reasonable officer in Sgt. Chisholm's position (nor Sgt. Chisholm as his testimony on direct examination reflected) . . . would believe Mr. Castonguay's lack of a physical identification . . . was an indicator of drug activity." *Id.* at 3.

Second, after asserting "at the very latest, the traffic stop was completely over when Sgt. Chisholm returned to Mr. Castonguay's vehicle and handed him back his insurance and registration," Mr. Martinez suggests that certain facts cited by the Government "only became known to Sgt. Chisholm after he had already completed the traffic stop and transitioned the seizure to a drug investigation."  *Id.* at 3-4.

Third, Mr. Martinez maintains that "the distance [from] Van Buren to Presque Isle is of no relevance" because "[t]he Government elicited no testimony to support its inference that the distance to Presque Isle was a source of suspicion to Sgt. Chisholm, nor made arguments as to why an individual traveling to the largest nearby urban center to secure a hotel room would be a factor leading a reasonable officer to suspect drug trafficking."  *Id.* at 5.

Fourth, according to Mr. Martinez, "the factual record is insufficient to support a finding that Kennedy Terrace is a 'high crime area,'" and what's more, "any traveler

through Van Buren is traveling either away or in the direction of Kennedy Terrace" due to the layout of the town. *Id.* at 6-7.

Finally, Mr. Martinez argues that the Government "offers no explanation whatsoever" for why the fact that the vehicle was speeding and that "Sgt. Chisholm knew Mr. Castonguay and Ms. Carmichael 'relatively well' but [had] never seen Mr. Martinez before" support reasonable suspicion. *Id.* at 7-8.

After discussing the factors he contends are inappropriate bases for reasonable suspicion, Mr. Martinez "contends that the Government's analysis essentially boils down the following factors to support detention": (1) Deputy Chisholm's knowledge of Mr. Castonguay and Ms. Carmichael's previous drug use; (2) Mr. Martinez's demeanor during the initial traffic stop; (3) Mr. Martinez's movements while Deputy Chisholm was running his information; and (4) Mr. Martinez's Portland address. *Id.* at 8. According to Mr. Martinez, "these facts, taken together, are not enough" to provide reasonable suspicion to convert the traffic stop into a drug investigation. *Id.*

Mr. Martinez then turns to the pat-down frisk. *Id.* at 9-12. According to Mr. Martinez, "the Government has failed to offer adequate serious officer-safety considerations to justify removal of Mr. Martinez from the vehicle." *Id.* at 10. Mr. Martinez then reiterates that "Sgt. Chisholm's own testimony makes clear that he did not believe the bulge to be a weapon," and adds that "the Government failed to elicit any testimony about what type of weapon remotely resembled a 'diaper' in feel." *Id.* at 10. Therefore, Mr. Martinez continues, "[a]s Sgt. Chisholm did not believe the mass was a weapon, his continued exploration of Mr. Martinez's crotch area clearly

transgressed the carefully delineated bounds of *Terry* and thus was a search." *Id.* at 11.

Regarding the Government's argument that Deputy Chisholm had probable cause to arrest Mr. Martinez by the time he squeezed the bulge in Mr. Martinez's pants, Mr. Martinez first asserts that the Government "cites to no legal authority to support its argument." *Id.* at 11. Analogizing his situation to the facts of *United States v. Look*,[4] No. 1:19-cr-00118-LEW, 2020 U.S. Dist. LEXIS 24505 (D. Me. Feb. 12, 2020), Mr. Martinez ultimately concludes that "as in [*Look*], [] Sgt. Chisholm did not have probable cause for an arrest and his search [was] unlawful." *Id.* at 11-12.

Turning to the Government's arguments for attenuation, Mr. Martinez maintains that "the Government's analysis both misconstrues relevant case law and, again, draws inferences unsupported by the evidentiary record." *Id.* at 13-15. Mr. Martinez further reiterates that Deputy Chisholm "discovered the contraband while conducting the illegal search," meaning that his "flight is not an intervening circumstance." *Id.* at 13. Mr. Martinez then adds that "the Government has not proved that [he] abandoned the drugs," and therefore abandonment "should not be factored into the Court's analysis as to application of the attenuation doctrine." *Id.* at 13-14.

Finally, regarding standing, Mr. Martinez "submits he has met his burden in establishing a reasonable expectation of privacy" for the reasons discussed in his previous filings. *Id.* at 15.

---

[4] Mr. Martinez refers to this case as *United States v. Miranda*, a companion case to *United States v. Look*.

29

## IV.   DISCUSSION

### A.   The Traffic Stop[5]

#### 1.   Deputy Chisholm's Actions in Pursuit of the Mission of the Stop

Although he concedes the lawfulness of the initial stop, Mr. Martinez argues that the traffic stop nonetheless violated his Fourth Amendment rights because "Deputy Chisholm lacked a reasonable articulable basis to expand the stop beyond the traffic infraction." *Def.'s Mot.* at 7.  This is so, he contends, because "when an officer conducts a stop for a traffic violation, they may not prolong the stop to conduct unrelated inquiries absent a reasonable articulable basis of other criminal activity." *Def.'s Mem.* at 7.  With this argument in mind, the Court turns to the events after Deputy Chisholm stopped Mr. Castonguay's car.

In general, "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (second and third alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to

---

[5]      Mr. Martinez does not challenge the lawfulness of the traffic stop itself.  *See Gov't's Opp'n* at 19 ("Defendant does not challenge the legitimacy of the stop itself, but rather what happened after the stop").   The Court has not addressed this issue, except to note that the record demonstrates that Deputy Chisholm witnessed "unlawful conduct involving a motor vehicle," *see United States v. Jenkins*, 680 F.3d 101, 104 (1st Cir. 2012), as he witnessed Mr. Castonguay's sedan travelling fifteen miles-per-hour over the posted speed limit, as confirmed by his radar.  *Chisholm Narrative* at 1-2.  Therefore, the Court concludes that Deputy Chisholm had reasonable suspicion to initiate the traffic stop.  *See United States v. Carr*, 534 F. Supp. 3d 143, 147 (D. Me. 2021) ("[I]nitiation of a traffic stop will not violate the detained individuals' constitutional rights if the stop is supported by the officer's observation of a traffic violation") (citing *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009)).

address the traffic violation that warranted the stop." *Id.* at 354 (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (alteration in original) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Accordingly, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 740 U.S. 675, 686 (1985)).

On a more granular level, after the initiation of a lawful traffic stop, "actions undertaken pursuant to that stop must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" *United States v. Ruidiaz*, 529 F.3d 25, 28-29 (1st Cir. 2008) (quoting *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)). In "determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 575 U.S. at 355 (alteration in original) (quoting *Caballes*, 543 U.S. at 408). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979)). It is also permissible for an officer conducting a traffic stop to "inquire into the driver's itinerary." *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) (citing *United States v. Fernandez*, 600 F.3d 56, 60-62 (1st Cir. 2010); and *United States v. Chhien*, 266 F.3d 1, 9 (1st Cir. 2001)). This is true even when such questioning is "not directly related to the violations that induced the stop in the first place." *United States v. Dunbar*, 553 F.3d 48, 56 (1st Cir. 2009) (quoting *Chhien*, 266 F.3d at 9). "In addition,

due to the 'inherent dangers of a traffic stop,' the police may request identification from passengers in the vehicle, so long as those requests 'do not measurably extend the duration of the stop.'" *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018) (quoting *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009)).

The record here shows that in the initial moments of the stop, Deputy Chisholm limited his activities to conducting the "ordinary inquiries incident to such a stop." *See Caballes*, 543 U.S. at 408. Upon approaching the vehicle, Deputy Chisholm asked the driver, Mr. Castonguay, where he was going and why he was in such a hurry. *First Video* at 00:28:24. This was a permissible inquiry "into the driver's itinerary." *See Dion*, 859 F.3d at 125. Next, Deputy Chisholm asked all three occupants of the vehicle for identification and asked Mr. Castonguay for the vehicle's registration and insurance information. *First Video* at 00:28:26. These inquiries were also permissible within the context of a traffic stop. *See Rodriguez*, 575 U.S. at 355; *Clark*, 879 F.3d at 4. Therefore, Deputy Chisholm's actions during the initial moments of the traffic stop fell within the pursuit of the mission of the stop.

### 2.    Reasonable Suspicion[6]

---

[6]    Fixing the point at which Deputy Chisholm deviated from conducting a traffic stop requires the Court to grapple with a circuit split, which the parties did not adequately brief in their filings. Since the Supreme Court decided *Rodriguez*, lower courts have struggled with how to resolve an apparent ambiguity in the Supreme Court's reasoning, namely, how to reconcile that the *Rodriguez* Court "seems to imply that nearly anything an officer does outside the valid, traffic-based inquiries will be unconstitutional" with other language in the opinion that "suggests a more forgiving approach toward non-traffic-based actions." *United States v. Green*, 897 F.3d 173, 179-82 (3d Cir. 2018); *see also United States v. Campbell*, 970 F.3d 1342, 1352-56 (11th Cir. 2020), *vacated on other grounds*, 981 F.3d 1014. As a result of this ambiguity, some circuits have "held that any diversion from a stop's traffic-based mission is unlawful absent reasonable suspicion." *Green*, 897 F.3d at 180-81; *see also United States v. Gomez*, 877 F.3d 76, 90-91 (2d Cir. 2017). "Other Circuits have applied *Rodriguez* more leniently, evaluating police actions by something more akin to a reasonableness standard." *Green*, 897 F.3d at 181; *see also United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016). The parties have not pointed the Court to any First Circuit caselaw addressing *Rodriguez* and the circuit split.

It is a closer call, however, whether Deputy Chisholm's next series of actions was "reasonably related in scope to the stop itself." *See Ruidiaz*, 529 F.3d at 28-29. After once again inquiring about the group's travel plans and receiving a different answer, Deputy Chisholm asked Mr. Castonguay whether there were any drugs, alcohol, or firearms in the vehicle and received a negative response. *First Video* at 00:29:20-00:29:22. He then asked, "if my canine ran around the outside [of the vehicle], would he alert to anything?" *Id.* at 0:29:22-00:29:25. Finally, he asked Mr. Castonguay whether he had "any issue with me looking through the vehicle?" *Id.* at 00:29:25-00:29:34.

The Government provided no authority directly approving either Deputy Chisholm's drug-related questions or his request to search the vehicle as being "reasonably related in scope" to a traffic stop. Nor is the Court aware of any. First Circuit authority can be read to suggest that such questions, without more, are impermissible in the context of a traffic stop. *See Chhien*, 266 F.3d at 9 ("Such scenarios, in which an officer stops a car for a minor traffic infraction and asks a known suspect pointed questions about a serious crime unrelated to the original violation, raise legitimate concerns about abuse of authority").

Instead, the Government presents two arguments that Deputy Chisholm's actions were permissible. First, the Government contends that Deputy Chisholm's

---

Based on the state of the record, the Court has not addressed the circuit split and the so-called *Rodriguez* moment in this order, namely the point at which Deputy Chisholm's actions arguably became impermissible in the context of a traffic stop. As these issues have not been fully briefed, the Court expresses no opinion on them. If Mr. Martinez wishes to raise *Rodriguez*, the so-called *Rodriguez* moment, or the circuit split, he is free to do so, based on this record, if he wishes.

33

questions were "permissible based on legitimate safety concerns." *Gov't's Mem.* at 18. Second, even if Deputy Chisholm's inquiries cannot be justified as safety-related measures, the Government contends that Deputy Chisholm had reasonable suspicion of drug-related activity by the time he asked these questions. *Id.* at 15-17. The Court addresses each argument in turn.

With respect to the Government's safety-related argument, whatever merit this contention might have in the abstract, the record makes it clear that Deputy Chisholm was not asking about drugs and potentially searching the vehicle because he was concerned for his safety. Deputy Chisholm knew Mr. Castonguay and Ms. Carmichael from prior dealings, and he was evidently relaxed and friendly during the outset of the stop. In fact, even as he asked questions of Mr. Castonguay and Ms. Carmichael outside the car, Deputy Chisholm maintained his pleasant and nonconfrontational demeanor.

From Deputy Chisholm's testimony on both direct and cross-examination, the Court finds that Deputy Chisholm made these inquiries because he wanted to investigate whether there were drugs in Mr. Castonguay's car. *See Suppression Tr.* at 51:1-25 ("Q. Okay. And what's the purpose of asking this question? A. I -- many cases of mine, especially when I have a rapport and know the people, is they'll be up front with me. They can tell me, yes, I just have a little bit. They could just say I just have my meth pipe today, paraphernalia. And so I get an indication on kind of their response to that question as to whether or not something is in the vehicle or they're possessing anything at that point"); *id.* at 105:8-107:12. Nowhere in the record does

Deputy Chisholm state, or even imply, that he asked about drugs and a potential search because he was concerned for his safety and the Court's own view of the encounter strongly suggests otherwise. Therefore, the Court rejects the Government's safety-related argument, which it considers to be a post hoc rationalization for Deputy Chisholm's conduct. *See Henderson*, 463 F.3d at 45-47 (rejecting the government's argument that an officer's actions were justified for reasons of officer safety because there was no evidence in the record supporting such a rationale).

The Court's conclusion that Deputy Chisholm's questions were not grounded in safety interests does not mean, however, that the inquiries violated Mr. Martinez's Fourth Amendment rights. After considering the record, the Court agrees with the Government's second argument: that Deputy Chisholm had reasonable suspicion of drug-related activity when he asked these questions.

Although a police officer may not ordinarily prolong a traffic stop beyond the time necessary to investigate the underlying traffic infraction, "[r]easonable suspicion may nonetheless develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the time needed to accomplish its original purpose." *United States v. Ramdihall*, 859 F.3d 80, 90 (1st Cir. 2017). "While no perfectly precise definition of reasonable suspicion exists, it is well established that, in terms of the continuum of knowledge, reasonable suspicion requires more than a mere hunch but less than probable cause." *Ruidiaz*, 529 F.3d at 29. Indeed, "the Supreme Court has cautioned that reasonable suspicion, like probable cause, is not

amenable to technical formulations that purport to identify the precise types of conduct or sets of circumstances that will or will not permit a police officer to stop and detain an individual." *United States v. Sowers*, 136 F.3d 24, 28 (1st Cir. 1998) (citing *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996)).

This lack of a precise formulation is not to say that courts are without guidance for assessing reasonable suspicion. "In evaluating whether reasonable suspicion exist[s, courts] 'look at the totality of the circumstances in each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006) (second alternation in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Reasonableness . . . is a construct that must be judged according to objective criteria; it is not dependent on an individual officer's subjective motives." *Ruidiaz*, 529 F.3d at 29; *accord United States v. Fagan*, 71 F.4th 12, 18 (1st Cir. 2023) ("In gauging whether the circumstances generate a reasonable suspicion, [courts] apply 'an objective standard, rather than assessing the subjective intent of an individual officer'") (quoting *United States v. Tiru-Plaza*, 766 F.3d 111, 116 (1st Cir. 2014)).

In addition to being an objective standard, reasonable suspicion is a "determination that entails a measurable degree of deference to the perceptions of experienced law enforcement officers." *Ruidiaz*, 529 F.3d at 29 (citing *Ornelas*, 517 U.S. at 699; and *Chhien*, 266 F.3d at 8). Indeed, the Supreme Court has written that reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

36

available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).   Further, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277; *see also Kansas v. Glover*, 140 S. Ct. 1183, 1190 (2020) ("[O]fficers, like jurors, may rely on probabilities in the reasonable suspicion context").

"To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *Chhien*, 266 F.3d at 6.   "After all, while an officer's actions must bear in some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees, if his suspicions mount during the course of the detention." *Id.*   This is because "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." *Dion*, 859 F.3d at 125 (quoting *Terry v. Ohio*, 392 U.S. 1, 10 (1968)).

Here, by the time Deputy Chisholm asked Mr. Castonguay about the potential presence of drugs in the vehicle, the following facts had come to light: (1) Deputy Chisholm initiated the traffic stop at approximately 12:15 am on September 5, 2021; (2) the driver of the sedan, Mr. Castonguay, had a habit of using illegal drugs as recently as 2019; (3) the front passenger, Ms. Carmichael, also used illegal drugs as

recently as 2019; (4) Mr. Castonguay and Ms. Carmichael lived at Kennedy Terrace, in the apartment directly across from "S"; (5) less than an hour earlier, Deputy Chisholm had seen activity at Kennedy Terrace outside the apartment of "S," whom he had previously charged with drug possession; (6) Mr. Castonguay initially told Deputy Chisholm that he was driving to Presque Isle but later said he was driving to Caribou; (7) Mr. Castonguay did not have his driver's license with him; (8) the rear passenger in the sedan, Mr. Martinez, did not make eye contact with Deputy Chisholm and slouched in his seat looking away from Deputy Chisholm—which made Deputy Chisholm believe that Mr. Martinez was trying to dissociate himself from the situation; (9) Mr. Martinez's Maine driver's license listed his address as a P.O. box in Portland; (10) Deputy Chisholm knew from MDEA briefings that large quantities of drugs were being shipped into Aroostook County from larger cities in Maine, including Portland; and (11) drug dealers coming to Aroostook County from places like Portland use local residents to drive them around.

Viewing these factors together, as it must, the Court concludes that sufficient reasonable suspicion existed for Deputy Chisholm to inquire about the presence of drugs in the car and potentially searching the vehicle. In reaching this conclusion, the Court adopts the holdings of other courts, which have found that factors similar to those described above can support reasonable suspicion when considered in combination with other facts. *See Tiru-Plaza*, 766 F.3d at 121 (factoring the time of a stop, which occurred at 11:00 pm, into the reasonable suspicion analysis); *Chaney*, 584 F.3d at 22-23, 26 (considering the defendant's "nervous demeanor" as a basis for

reasonable suspicion, when the officer had testified that passengers during traffic stops "generally make eye contact or at least engage in some sort of conversation with the officer"); *United States v. Lamela*, 942 F.2d 100, 102 (1st Cir. 1991) (noting that the defendant "gave inconsistent responses to routine questions relating to the purpose of his travel").

It is true that any one of these facts, in isolation, would not create sufficient reasonable suspicion to justify Deputy Chisholm's drug-related questions. However, "a fact that is innocuous in itself may in combination with other innocuous facts take on added significance." *Dion*, 859 F.3d at 125 (quoting *Ruidiaz*, 529 F.3d at 30); *accord Tiru-Plaza*, 766 F.3d at 121 ("[A] number of innocuous facts viewed together may form the basis of reasonable suspicion"). Further, although the factors described above could have an innocent explanation, a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Likewise, although a layperson might view these factors as innocuous, the Court has considered Deputy Chisholm's experience as a drug-interdiction specialist. *Dion*, 859 F.3d at 125 (stressing that the reasonable suspicion analysis "entails a measurable degree of deference to the perceptions of experienced law enforcement officers" (quoting *Ruidiaz*, 529 F.3d at 29)).

The Court further stresses that Deputy Chisholm's actions were "fairly responsive to the emerging tableau." *Chhien*, 266 F.3d at 6. Deputy Chisholm's questions about the presence of drugs and consent to search lasted only fourteen seconds. *See First Video* at 00:29:20-00:29:34. Deputy Chisholm took no actions in

response to Mr. Castonguay's answers to his questions. He did not deploy Jazz for a K-9 sniff, nor did he act on Mr. Castonguay's consent to search the car. Instead, he went back to investigating the speeding violation—the original mission of the traffic stop—by returning to his police cruiser to run checks on the occupants' information, starting with Mr. Castonguay, the driver. *Chisholm Narrative* at 2: *Suppression Tr.* at 52:11-18; 53:21-54:1. This behavior conforms with First Circuit precedent that an officer "may shift his focus and increase the scope of his investigation by degrees, if his suspicions mount" because Deputy Chisholm acted in accordance with the amount of reasonable suspicion that existed at the time. *See Chhien*, 266 F.3d at 6.

Mr. Martinez maintains that it is improper for the Court to consider a number of the factors referenced above in its reasonable suspicion analysis. *Def.'s Reply* at 7-12; *Def.'s Reply Mem.* at 2-7. "But the Supreme Court has flatly rejected just this sort of 'divide-and-conquer analysis' because it is inconsistent with the requirement that courts examine the totality of the circumstances." *Dion*, 859 F.3d at 125 (quoting *Arvizu*, 534 U.S. at 274); *see also Arvizu*, 534 U.S. at 274 (noting that the lower court's "evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase"). Although Mr. Martinez does eventually jointly evaluate the facts he contends are permissible to consider, the Court views his attempt to eliminate several facts before undertaking this analysis as being at odds with Supreme Court and First Circuit precedent. Nonetheless, the Court briefly examines Mr. Martinez's most salient arguments.

First, Mr. Martinez argues that Mr. Castonguay's lack of identification "should be afforded no weight" due to Deputy Chisholm's testimony that this "was of no concern to him" and because "no reasonable officer . . . would believe Mr. Castonguay's lack of a physical identification at that time was an indicator of drug activity." *Def.'s Reply Mem.* at 2-3.  Although Deputy Chisholm did testify that he was not concerned by Mr. Castonguay's lack of identification, *see Suppression Tr.* at 42:14-18, his subjective impressions have no bearing on the reasonable suspicion analysis, *see Fagan*, 71 F.4th at 18 ("In gauging whether the circumstances generate a reasonable suspicion, we apply 'an objective standard, rather than assessing the subjective intent of an individual officer'" (quoting *Tiru-Plaza*, 766 F.3d at 116).  Accordingly, the Court must consider what a reasonable officer would have thought, not what Deputy Chisholm actually thought.

Mr. Martinez does assert that no reasonable officer "who had personal knowledge of the individual, had no reason to suspect the vehicle to be stolen, and where the individual volunteered their license number" would view Mr. Castonguay's lack of a driver's license as an indicator of drug activity. *Def.'s Reply Mem.* at 3.  But Mr. Martinez provides no support for this assertion, and, when analyzed, it cuts both ways.  The record reveals that Deputy Chisholm also knew that Mr. Castonguay had a job driving a truck.  *See Suppression Tr.* at 60:17-25.  Imputing this knowledge to a hypothetical reasonable officer, then, it would seem that Mr. Castonguay would be used to driving with his license on his person because of his job.  In light of the other facts in the record, such as the time of night and Mr. Castonguay's inconsistent

41

explanations of his travel plans, the Court finds that a reasonable officer could have interpreted Mr. Castonguay's lack of a license as some slight suggestion that something was amiss. At the same time, a driver might not have his driver's license with him for a host of reasons, and therefore the Court considers Mr. Castonguay's lack of identification in its reasonable suspicion calculus but does not view this factor as significant.

Mr. Martinez next takes issue with the Government's characterization of Kennedy Terrace as a "high crime area" because "the factual record is insufficient to support a finding that Kennedy Terrace is a 'high crime area.'" *Def.'s Reply Mem.* at 6-7. In support of this assertion, he cites *United States v. Wright*, 485 F.3d 45 (1st Cir. 2007), which articulates specific factors for courts to consider in determining whether a particular location is a "high crime area." *Id.* at 53-54. Mr. Martinez contends that the Government has failed to present sufficient evidence to satisfy the factors articulated in *Wright*. *Def.'s Reply Mem.* at 6-7. Alternatively, Mr. Martinez suggests that "the Court need not reach this issue as the stop did not occur at Kennedy Terrace." *Id.* at 7.

The Court agrees with Mr. Martinez that it does not need to consider whether Kennedy Terrace is a "high crime area" because Deputy Chisholm's general observations about Kennedy Terrance do not add anything to the reasonable suspicion analysis. The Court nonetheless finds it proper to consider Deputy Chisholm's knowledge about specific residents at Kennedy Terrace, including Mr. Castonguay, Ms. Carmichael, and "S." This knowledge stems from Deputy

Chisholm's past interactions with these individuals and is not tied to his general observations about Kennedy Terrace.   To the extent that Deputy Chisholm's perception of Kennedy Terrace matters here, it is only to explain why he chose to drive through the complex earlier in the evening, which is irrelevant to reasonable suspicion for his later stop of Mr. Castonguay.   Therefore, the Court confirms that it has not accepted the Government's representation that Kennedy Terrace is a "high crime area," nor has it factored Deputy Chisholm's general observations about Kennedy Terrace into its reasonable suspicion analysis.

Mr. Martinez also disputes the propriety of considering his Portland residence in the reasonable suspicion analysis because "there is nothing suspicious about a[] visitor to Aroostook County, from Portland." *Def.'s Reply* at 9.   Of course, the mere fact that a person from Portland is visiting Aroostook County cannot by itself be suspicious.   But facts unremarkable in isolation can take on added significance in combination with other innocuous facts.   *See Dion*, 859 F.3d at 125 ("Indeed, 'a fact that is innocuous in itself may in combination with other innocuous facts take on added significance'" (quoting *Ruidiaz*, 529 F.3d at 30)).   Here, Deputy Chisholm knew that large quantities of drugs were entering Aroostook County from Portland and that Mr. Martinez was riding with two individuals who had used drugs in the past, articulated inconsistent travel plans, and lived across from another individual known to have used drugs, at whose apartment Deputy Chisholm had noticed significant activity less than an hour before the traffic stop.   Viewed in combination with facts such as these, Mr. Martinez's residence in Portland takes on added significance, and

the Court concludes that it is proper to consider it in the reasonable suspicion analysis.

Mr. Martinez then asserts that the time of the traffic stop "adds nothing to the basis for the prolonged detention." *Def.'s Reply* at 10. In support of this argument, he cites *United States v. Boyd*, No. 2:19-cr-00175-NT, 2021 U.S. Dist. LEXIS 220080 (D. Me. Nov. 15, 2021). In *Boyd*, a Maine state trooper pulled over a vehicle in which the defendant was a passenger at 10:24 pm while traveling on the Maine Turnpike. *Id.* at *1-2, *7-8. The court in *Boyd* found that the time of the stop did not add "much, if anything, to the basis for the stop" because "a lot of people are still out and going about legitimate business at 10:30 pm." *Id.* at *8. But 10:24 pm is almost two hours earlier than 12:15 am. Further, 12:15 am is much closer to, and even later than, times that courts have considered in making findings of reasonable suspicion. *See Tiru-Plaza*, 766 F.3d at 121 (factoring the time of a stop, which occurred at 11:00 pm, into the reasonable suspicion analysis); *United States v. Soares*, 521 F.3d 117, 118, 121 (1st Cir. 2008) (considering the time of a traffic stop, which occurred at 1:15 am, in the reasonable suspicion analysis). Therefore, the Court considers the time at which Deputy Chisholm stopped Mr. Castonguay's car in its reasonable suspicion determination.

Finally, Mr. Martinez argues that nervousness "is a common and entirely natural reaction to police presence," which "is especially acute for people of color" such as himself. *Def.'s Reply* at 10-12. To the extent that Mr. Martinez is arguing that it is improper to consider his demeanor, the Court observes that First Circuit caselaw

makes it clear that nervousness can form a basis for reasonable suspicion, at least when considered in combination with other facts. *See Dion*, 859 F.3d at 126 (observing that the defendant's nervousness "while not indicative of criminal activity standing on [its] own, can (and should) be thrown into the reasonable-suspicion mix under our case law"); *United States v. De Jesus-Viera*, 655 F.3d 52, 58 (1st Cir. 2011) (noting, when analyzing reasonable suspicion, that the defendant "was visibly nervous and avoided eye contact with each of the officers"); *Chaney*, 584 F.3d at 26 (factoring the defendant's "nervous demeanor" into the officer's reasonable suspicion).

Still, Mr. Martinez cites *United States v. McKoy*, 428 F.3d 38 (1st Cir. 2005), for the proposition that "[n]ervousness is a common and entirely natural reaction to police presence." *Id.* at 40. In *McKoy*, however, the First Circuit specifically evaluated whether there was reasonable suspicion that the defendant "was dangerous and posed a threat to [the officers'] safety." *Id.* The *McKoy* court ultimately rejected the government's reasonable suspicion argument, which relied solely upon "(1) the dangerousness of the neighborhood and (2) McKoy's nervous appearance and movements inside the car." *Id.* Thus, there are two key differences between *McKoy* and the present case. First, at issue here is whether there was reasonable suspicion of criminal activity, not whether there was reasonable suspicion that Mr. Martinez was armed and dangerous. Second, there are far more facts supporting reasonable suspicion here than in *McKoy*, as the Court recounted above. As a result, the Court notes that while nervousness may be a natural reaction to

police presence, especially for people of color, the weight of First Circuit precedent rejects Mr. Martinez's argument that it is improper to consider his nervousness.

To the extent Mr. Martinez's argument is that Deputy Chisholm was engaged in racial profiling when he targeted Mr. Martinez for a drug investigation, precedent makes it clear that racial profiling by itself cannot give rise to a valid Fourth Amendment claim.[7]  *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment"); *Fagan*, 71 F.4th at 23 ("[R]acial profiling, while a violation of the Fourteenth Amendment, does not trigger the exclusionary rule as it might were it a Fourth Amendment violation").

The Court acknowledges that the optics of this situation are potentially troubling, as Mr. Martinez was the only person of color in the car, and Deputy Chisholm, who is white, became suspicious of Mr. Martinez early in the encounter. Mr. Martinez cites *United States v. Washington*, 490 F.3d 765, 770-74 (9th Cir. 2007), in support of his contention that other courts have "outright rejected" the consideration of behavior that may be explained by nervousness.  *Def.'s Reply* at 12. But the *Washington* court was adjudicating a different issue—whether a seizure had occurred—and cited specific sources of tension between the Portland, Oregon police

---

[7]      The First Circuit has found that racial bias can be a factor undercutting the credibility of a testifying officer.  *See Fagan*, 71 F.4th at 22 ("[E]vidence of an officer's racial bias in deciding which drivers to surveil and stop can undercut the credibility of the officer's description of the facts that supposedly justified the stop").  Here, Mr. Martinez has not disputed Deputy Chisholm's credibility based on alleged racial bias, and the Court, when viewing Deputy Chisholm's testimony in light of the rest of the record, finds Deputy Chisholm to be credible.

department and Black citizens.[8] *Id.* at 773-74. Because no such specifics are present in this case, and the *Washington* court never opined on reasonable suspicion, the Court declines to adopt Mr. Martinez's argument.

Having addressed all of Mr. Martinez's arguments concerning the individual factors included in its reasonable suspicion analysis, the Court now briefly discusses the latter stages of the traffic stop and concludes that, although Deputy Chisholm eventually abandoned his pursuit of the speeding violation, this decision was supported by adequate reasonable suspicion.

After asking Mr. Castonguay about the potential presence of drugs in the car and seeking permission to search the vehicle, Deputy Chisholm returned to his police cruiser to run checks on the occupants' information. *Chisholm Narrative* at 2; *Suppression Tr.* at 52:11-18. By the time he returned to Mr. Castonguay's car, the record makes it clear that Deputy Chisholm was focused on conducting a drug investigation. Deputy Chisholm admitted this at the evidentiary hearing, acknowledging that he did not have any intention of issuing Mr. Castonguay a ticket when he returned to the car. *See Suppression Tr.* at 100:24-101:10; *see also Def.'s Mem.* at 7 (arguing that "it is undisputed that when [Deputy Chisholm] returned to the vehicle the traffic stop was over").

In light of the record before it, the Court concludes Deputy Chisholm's decision to initiate a drug investigation was supported by adequate reasonable suspicion.

---

[8]     Mr. Martinez also cites *United States v. Weaver*, 975 F.3d 94 (2d Cir. 2020), but that case was subsequently vacated en banc and the Court does not consider it. *See United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) (en banc).

While Deputy Chisholm was conducting his records checks, two key pieces of information came to light, which augmented his reasonable suspicion. First, Deputy Chisholm learned that Mr. Martinez's driver's license was associated with an address in California. *Suppression Tr.* at 56:7-11. Deputy Chisholm found this to be "odd" because it was the first time he had seen a Maine driver's license associated with a California address and he believed that ordinarily "if you live in Maine and you have a residency here, you would have an address in the state of Maine." *Id.* at 56:20-24.

In Maine, driver's license applicants typically must "provide documentary evidence of Maine residency," which "must contain an actual physical address [in Maine]." *Proving Maine Residency*, STATE OF ME. BUREAU OF MOTOR VEHICLES, https://www.maine.gov/sos/bmv/licenses/residency.html (last visited Dec. 11, 2023). Consistent with this provision, Deputy Chisholm's suspicions were reasonably heightened about Mr. Martinez's driver's license, when it was revealed that his Maine residence was a PO box. In light of the Maine requirement of an actual physical address, a reasonable officer in Deputy Chisholm's position may well have suspected that a Maine driver's license associated with an address in a different state could be fake, an effort to hide true residency, or otherwise associated with criminal activity.

Mr. Martinez urges the Court to disregard the irregularities with his driver's license in the reasonable suspicion calculus, stressing that the databases on Deputy Chisholm's computer did not flag the license as being illegal. *Def.'s Mem.* at 8. But this argument ignores Deputy Chisholm's testimony that his computer system sometimes makes mistakes. *Id.* at 93:13-20; 117:3-6. Further, a fact can contribute

to reasonable suspicion even if it is not associated with direct evidence of illegality. *See, e.g., Dion*, 859 F.3d at 125 ("[A] fact that is innocuous in itself may in combination with other innocuous facts take on added significance" (quoting *Ruidiaz*, 529 F.3d at 30)). The Court rejects Mr. Martinez's argument that his driver's license with its PO box address may not be considered in the reasonable suspicion analysis.

The second key piece of information that came to light while Deputy Chisholm was conducting his records checks was Deputy Chisholm's observations about what was occurring in Mr. Castonguay's car. Specifically, Deputy Chisholm observed "[Mr. Martinez] moving around a lot in the back seat and [Ms. Carmichael] looking back at my cruiser as if she [was] keeping a look out on what I was doing." *Chisholm Narrative* at 2; *Suppression Tr.* at 52:21-55:12. While this was occurring, Mr. Martinez was looking down, and Ms. Carmichael "would look down at him in that same area and then look back" at the police cruiser. *Suppression Tr.* at 55:9-18. Deputy Chisholm testified at the suppression hearing that he found this behavior to be "very odd." *Id.* at 111:20-24. Taken together, the Court concludes that a reasonable police officer would suspect from these observations that the occupants of the vehicle possessed an object they did not want Deputy Chisholm to know about.

Mr. Martinez disagrees, arguing that his alleged movements "were not sufficient to expand the scope of the stop." In support of this contention, he again relies upon *United States v. McKoy*, 428 F.3d 38 (1st Cir. 2005). But the movements in *McKoy* were quite different than the movements in this case. In *McKoy*, the officers saw the defendant "twice lean and move his arm toward the center console area of

the vehicle." *Id.* at 39.  Here, in contrast to the small number of movements observed by the officers in *McKoy*, the record reveals that Deputy Chisholm noticed Mr. Martinez moving around "a lot" in the car.  *Chisholm Narrative* at 2.  Further, although the movements in this case, like those in *McKoy*, could have an innocent explanation, such as texting, Ms. Carmichael's actions support an inference that the movements were more nefarious, as they suggest that the occupants of the car did not want Deputy Chisholm to see what Mr. Martinez was doing.  Therefore, based on the factual differences between *McKoy* and the present case, the Court finds *McKoy* inapposite and rejects any contention by Mr. Martinez that his movements did not contribute to reasonable suspicion in this case.

In light of the totality of the circumstances, the Court concludes that Deputy Chisholm's actions were "fairly responsive to the emerging tableau" of what he learned during the traffic stop, *see Chhien*, 266 F.3d at 6, and that sufficient reasonable suspicion existed for Deputy Chisholm to take these actions.  Accordingly, the Court concludes that the traffic stop of Mr. Castonguay's car was not unlawfully prolonged in violation of the Fourth Amendment and the Court denies Mr. Martinez's motion to suppress insofar as it rests upon this basis.

### B.    The Pat-Down Frisk

Mr. Martinez further argues that Deputy Chisholm violated his Fourth Amendment rights by subjecting him to an unlawful pat-down frisk.  *Def.'s Mot.* at 7-8; *Def.'s Reply* at 12-13; *Def.'s Mem.* at 9; *Def.'s Reply Mem.* at 9-12.  In support of this contention, Mr. Martinez makes two arguments.  First, Mr. Martinez claims that "the

Government has failed to offer adequate serious officer-safety considerations to justify the removal of Mr. Martinez from the vehicle." *Def.'s Reply Mem.* at 10. Second, Mr. Martinez argues that Deputy Chisholm impermissibly continued to manipulate the bulge in his pants after determining that it was not a weapon. The Court addresses each argument in turn.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30. A protective frisk undertaken pursuant to *Terry* "must be 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *United States v. Schiavo*, 29 F.3d 6, 8-9 (1st Cir. 1994) (quoting *Terry*, 392 U.S. at 26). "If the frisk goes beyond what is necessary to determine if the suspect is armed, its fruits will be suppressed." *United States v. Campa*, 234 F.3d 733, 738 (1st Cir. 2000) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 373, 378-79 (1993)). "[I]n determining whether a pat-down search is an appropriate step following a valid *Terry* stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) (quoting *Schiavo*, 29 F.3d at 8).

The First Circuit has described a pat-down search that occurs during a traffic stop as "a *Terry* stop within a *Terry* stop." *Chhien*, 266 F.3d at 7. This means that the mere fact of a traffic stop is insufficient to justify a pat-down frisk; rather "[t]o justify a patdown of the driver or a passenger during a traffic stop, . . . just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *see also United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011) (declaring, with respect to traffic stops, that if an officer "has some articulable, reasonable suspicion that the persons stopped may be dangerous, he can pat them down . . . for weapons that they could quickly lay their hands on").

Turning to Mr. Martinez's first argument—that "the Government has failed to offer adequate serious officer-safety considerations to justify the removal of Mr. Martinez from the vehicle"—the Court interprets Mr. Martinez's contention to be that there was insufficient reasonable suspicion to justify a pat-down search. Read literally, Mr. Martinez's argument is foreclosed by the Supreme Court's decision in *Maryland v. Wilson*, 519 U.S. 408 (1997), which held that police officers may "as a matter of course" order passengers to exit the vehicle during a traffic stop. *Id.* at 410. Under *Wilson*, the Government need not justify a passenger's removal by offering officer-safety considerations. Therefore, Mr. Martinez's contention would be irrelevant were it to apply only to his removal from the vehicle.

Even assuming that Mr. Martinez did intend to contest the justification for Deputy Chisholm's pat-down frisk, the Court concludes that the facts here give rise to reasonable suspicion that Mr. Martinez was armed and dangerous. By the time Deputy Chisholm began his pat-down frisk of Mr. Martinez, the following facts had come to light: (1) Mr. Martinez had been moving back and forth while staring at his crotch area or the floorboard of the car while Deputy Chisholm was conducting records checks; (2) Ms. Carmichael periodically looked down at the same area during this time while also looking back at Deputy Chisholm's police cruiser; (3) Mr. Martinez's hands were once again in the area of his crotch when Deputy Chisholm approached the car to ask Ms. Carmichael to step out; and (4) Mr. Martinez stopped whatever activity he had been engaged in with respect to his crotch when Deputy Chisholm began speaking to Ms. Carmichael about stepping out of the car. These combined facts suggest that Mr. Martinez was preoccupied with something, which he did not want Deputy Chisholm to discover, in the area of his crotch. Given that a person could reasonably hide a weapon in the area of their crotch, these facts support the conclusion that reasonable suspicion existed that Mr. Martinez was armed and dangerous.

The Court further notes the existence of the following facts: (1) Deputy Chisholm was the only officer on scene, and there were three people in Mr. Castonguay's car; (2) the stop occurred late at night, at approximately 12:15 am; (3) Deputy Chisholm estimated that it would take twenty-five to thirty minutes for backup to arrive; and (4) Deputy Chisholm suspected Mr. Martinez of being engaged

in drug-related activity. These facts are of the type the First Circuit has relied upon in finding reasonable suspicion that an individual was armed and dangerous. *See Tiru-Plaza*, 766 F.3d at 121 ("Objectively, this situation gives rise to a reasonable concern for officer safety—the officers were outnumbered, in relative darkness, and could reasonably believe that they were dealing with the volatile situation of a possible car theft"). While each of these factors, "taken alone, create no suspicion of criminal activity," *id.*, the Court concludes that, in combination with Mr. Martinez's repeated movements in and around his crotch area, they give rise to reasonable suspicion that Mr. Martinez was armed and dangerous. Deputy Chisholm's initiation of a pat-down frisk did not violate Mr. Martinez's Fourth Amendment rights.

A pat-down frisk that is lawful at its inception, however, may nonetheless violate the Fourth Amendment if it is carried out in an improper manner. *See Campa*, 234 F.3d at 738 ("If the frisk goes beyond what is necessary to determine if the suspect is armed, its fruits will be suppressed"). This is because a pat-down frisk undertaken pursuant to *Terry* "must be 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Schiavo*, 29 F.3d at 8-9 (quoting *Terry*, 392 U.S. at 26). As a result, such a frisk typically takes the form of "a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Campa*, 234 F.3d at 738 (quoting *Sibron v. New York*, 392 U.S. 40, 65 (1968)).

Consistent with the limited scope of a pat-down frisk, an officer may not continue to investigate or manipulate an object after concluding that it is not a

54

weapon.  *See Schiavo*, 39 F.3d at 9 (finding that an officer exceeded the bounds of a legitimate pat-down frisk due to his "continued exploration of the brown paper bag in [the defendant's] pocket 'after having concluded that it contained no weapon'" (quoting *Dickerson*, 508 U.S. at 378)); *see also Dickerson*, 508 U.S. at 378 (declaring that "the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon . . . amounted to the sort of evidentiary search that *Terry* expressly refused to authorize" (internal quotation omitted)).

Mr. Martinez claims that Deputy Chisholm engaged in the type of conduct prohibited by *Dickerson* and *Schiavo* by continuing to investigate and manipulate the bulge in his crotch area even after concluding that it was not a weapon.  *Def.'s Mem.* at 9.  The Government disagrees, arguing that "[i]t was only upon Chisholm's additional squeezing that he determined the hidden object was not a weapon" and therefore the "squeezing was not beyond the scope of a proper pat-down because Chisholm had not yet ruled out the possibility it was a weapon."  *Gov't's Mem.* at 21. Because the Court views this as essentially a factual dispute, it recounts the evidence in the record in some detail.

When Deputy Chisholm first frisked Mr. Martinez's groin area with the back of his hand, he felt an object that was heavy and inconsistent with genitalia. *Suppression Tr.* at 66:23-67:1.  This object was in the center of Mr. Martinez's crotch, near where the seams of his pants met.  *Id.* at 67:9-10.  Deputy Chisholm testified that he could feel that the object "was larger than what's normal" and "had some weight to it," but he "couldn't tell exactly what size it was or anything like that."  *Id.*

at 67:3-6.  Further, Deputy Chisholm "couldn't identify if it was a weapon or it wasn't a weapon."  *Id.* at 67:13-14.

Deputy Chisholm then asked Mr. Martinez what the object was and Mr. Martinez replied that it was his penis.  *Second Video* at 00:43:50-00:44:30.  Deputy Chisholm stood up, and the following exchange occurred:

> **Deputy Chisholm:** All right.  Well, it doesn't feel like your cock.  Feels like you got something in there.  Do you have a diaper in there or what?
> **Mr. Martinez:** No.  I have nothing in there.
> **Deputy Chisholm:** So if my narcotics canine smelled your crotch, you're not going to have anything on your crotch.
> **Mr. Martinez:** No.  Of course not.  No.  No, sir.
> **Deputy Chisholm:** There's nothing in your crotch.
> **Mr. Martinez:** No.
> **Deputy Chisholm:** I'm not feeling anything in your crotch.
> **Mr. Martinez:** No, there's nothing.
> **Deputy Chisholm:** Okay.

*Second Video Tr.* at 13:13-14:5.

Deputy Chisholm testified that after this exchange he "went back and I made sure that the item was not a firearm, and I squeezed it maybe two or three times and determined that it wasn't a firearm or weapon, a knife, and that it -- it was more consistent with packaging."  *Suppression Tr.* at 68:2-15.  Based on these observations, Deputy Chisholm formed the opinion that the object was not a weapon but was contraband.  *Id.* at 70:12-19.  This testimony is consistent with Deputy Chisholm's police report, which was written on September 5, 2021, the same day as the challenged frisk, and states:

> While frisking [Mr. Martinez's] crotch area with the back of my hand I felt a large object in his crotch.  The object had mass inconsistent with genitals.  I asked Luis what was in his pants.  I was unsure at this time if the item was a weapon or not and Luis had not provided me with a

56

> concealed weapons permit or stated that he had a firearm. Due to his movements in the car, I investigated further and manipulated the item in his crotch to get a better understanding on what it was. I could feel the mass was consistent with packaging. I could feel what appeared to be tape around the object. Through my training, experience and education I deemed the item consistent with the packaging of illegal drugs.

*Chisholm Narrative* at 3-4. Based on Deputy Chisolm's testimony at the suppression hearing, which is consistent with his account on the date of the frisk, the Court concludes that Deputy Chisholm had not ruled out the possibility that he was feeling a weapon in Mr. Martinez's pants until he squeezed the object. Therefore, Deputy Chisholm's actions constituted a proper pat-down frisk.

Mr. Martinez objects to this conclusion on two grounds. First, he claims that "it is simply not credible to believe that an officer who over the ninety second search repeatedly asked whether Mr. Martinez was wearing a diaper or had something wrong with his penis, harbored a good-faith belie[f] that the object was a weapon."[9] *Def.'s Reply* at 13. The Court interprets Mr. Martinez to be referring to Deputy Chisholm asking, before he squeezed the object in Mr. Martinez's pants, "So if my narcotics canine smelled your crotch, you're not going to have anything on your crotch," and "Do you have a diaper in there or what?" *Second Video Tr.* at 13:13-21.

The record does not shine any light on why Deputy Chisholm made these statements, but they do not contradict Deputy Chisholm's testimony. The remarks

---

[9] The Court observes that not all of Mr. Martinez's assertions conform with the record. Only roughly forty seconds elapsed between when Deputy Chisholm first asked Mr. Martinez about the object in his pants and when Deputy Chisholm squeezed the object, and Deputy Chisholm was standing up and speaking with Mr. Martinez during roughly half of this time. *Second Video* at 00:43:49-00:44:30. Further, some of the comments Mr. Martinez references were made after Deputy Chisholm squeezed the object in his pants. *See id.* at 00:44:33-00:44:40.

do not suggest that Deputy Chisholm had ruled out the possibility that the object in Mr. Martinez's pants could be a weapon. At most, they suggest that Deputy Chisholm believed the object might be something other than a weapon. Therefore, the statements do not undercut the Court's conclusion that the Government has shown, by a preponderance of the evidence, that Deputy Chisholm had not ruled out that the object in Mr. Martinez's pants was a weapon when he squeezed it. *See United States v. Pardue*, 270 F. Supp. 2d 61, 65 (D. Me. 2003) ("The government bears the burden of establishing by a preponderance of the evidence that a warrantless search falls within" an exception to the warrant requirement).

Mr. Martinez's second objection to the propriety of the pat-down frisk is that Deputy Chisholm's testimony on cross-examination demonstrates that he "did not credibly believe the mass to be a weapon." *Def.'s Mem.* at 9. This contention centers on the following exchange between Deputy Chisholm and counsel for Mr. Martinez:

> **Mr. Hallett:** And would you agree with me that it appears from that interaction that you just had that you were clear that it was not a weapon located in Mr. Martinez's crotch?
> **Deputy Chisholm:** Yes, sir.

*Suppression Tr.* at 129:17-25. In response to Mr. Martinez's argument, the Government "respectfully contends that counsel's questioning . . . is somewhat confusing and Chisholm's answer doesn't clearly delineate where in the body-worn camera footage that the initial squeezing occurred. *Gov't's Reply Mem.* at 1 n.1.

While this exchange adds some ambiguity, the Court agrees with the Government that counsel for Mr. Martinez did not ask a particularly clear question. Before asking the question at issue, Attorney Hallett played seventy-one seconds of

Deputy Chisholm's body-camera footage. *Suppression Tr.* at 129:16. This portion of the video concludes with Deputy Chisholm asking, "So if my narcotics canine smelled your crotch, you're not going to have anything on your crotch," and "Do you have a diaper in there or what?" *Second Video Tr.* at 13:13-21. After playing the video, Attorney Hallett asked "whether it appears from that interaction" that Deputy Chisholm had concluded that the item in Mr. Martinez's pants was not a weapon. *Suppression Tr.* at 129:17-25. Deputy Chisholm responded that it did. *Id.*

Mr. Martinez urges the Court to conclude that Deputy Chisholm's affirmative response amounted to an admission that he had already determined the object was not a weapon before he squeezed it. But that would require the Court to find that Deputy Chisholm was responding to different question than the one he was asked, and there is no support in the record for such an inferential leap. Attorney Hallett asked Deputy Chisholm about the interaction in the video, and Deputy Chisholm merely responded "Yes, sir." *Suppression Tr.* at 129:17-25. Based on this response, the Court concludes that Deputy Chisholm was responding to the question he was asked.

Further, even viewing the exchange between Deputy Chisholm and Attorney Hallett in the light most favorable to Mr. Martinez, the Court still concludes that the Government has carried its burden of showing by a preponderance of the evidence that Deputy Chisholm did not rule out the possibility that the object in Mr. Martinez's pants was a weapon until he squeezed it. Deputy Chisholm's report, written on the day of the pat-down frisk, and his testimony at the suppression hearing unequivocally

support this conclusion.  A few statements suggesting that Deputy Chisholm thought the object could be something other than a weapon and an affirmative answer to an ambiguous question do not suffice to change the result.  As a result, the Court concludes that Deputy Chisholm's pat-down frisk of Mr. Martinez was lawful.

The Court has therefore reviewed the challenged aspects of Mr. Martinez's seizure and search and determines that no Fourth Amendment violations took place.[10]  As such, the Court does not reach the parties' arguments on standing and attenuation because these arguments presuppose Mr. Martinez's establishment of a Fourth Amendment violation.

## V.   CONCLUSION

The Court DENIES Luis Martinez's First Motion to Suppress (ECF No. 49).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 28th day of December, 2023

---

[10]   The Court does not reach the parties' arguments on standing and attenuation because these arguments presuppose Mr. Martinez's establishment of a Fourth Amendment violation.